```
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------X
Jose A. Done, Armando Tirado, Horatio
Wagstaffe, and Francisco Felix,

                    Plaintiffs,        03-CV-1614
                                       (CPS)(CLP)

        - against -
                                       MEMORANDUM
The Brooklyn Hospital Center,          AND ORDER
International Brotherhood of Electrical
Workers, Local Union No. 3, Propoco,
Inc., Thomas Grosso, Kenneth Ducalo,
Harvey Frumkin, Jack Delaporte, Kelvin
Dirk, John Cruz, and The City of New York,

                    Defendants.
----------------------------------------X
Gustavo Done and Derrick Grant,

                    Plaintiffs,        03-CV-1615
                                       (CPS)(CLP)

        - against -

The Brooklyn Hospital Center,
International Brotherhood of Electrical
Workers, Local Union No. 3, Propoco,
Inc., Thomas Grosso, Kenneth Ducalo,
Harvey Frumkin, Jack Delaporte, Kelvin
Dirk, John Cruz, and The City of New York,

                    Defendants.
----------------------------------------X
SIFTON, Senior Judge.
```

Plaintiffs Derrick Grant ("Grant"), Gustavo Done ("Gustavo Done"), Jose A. Done ("Jose Done"), Armando Tirado ("Tirado"), Horatio Wagstaffe ("Wagstaffe"), and Francisco Felix ("Felix") commenced two separate actions, later consolidated, against the Brooklyn Hospital Center ("Hospital"), the International Brotherhood of Electrical Workers, Local Union No. 3 (the

"Union"), Propoco, Inc., Tom Grosso, Kenneth Ducalo, Kevin Dirk, Harvey Frumkin, Jack Delaporte, John Cruz, and the City of New York. Plaintiffs have settled with or withdrawn their complaints against all defendants other than defendant Union ("defendant"). Plaintiffs brought the following claims against that defendant: breach of the duty of fair representation, in violation of Section 301 of the Labor Management Relations Act, 29 U.S.C. § 185(a)[1]; racial discrimination in violation of 42 U.S.C. § 1981; discrimination on the basis of race, color, and national origin in violation of Title VII of the Civil Rights Act of 1964, as amended, 41 U.S.C. § 2000e *et seq.* ("Title VII"); violation of the New York State Human Rights Law, N.Y. Exec. L. § 296 *et seq.*; violation of the NYSHLS, N.Y. Exec. L. § 8-107; conspiracy to deprive plaintiffs of their rights in violation of 42 U.S.C. § 1985(3); and failure to prevent the deprivation of plaintiffs' rights, in violation of 42 U.S.C. § 1986. On February 12, 2009, I granted defendant's motion for partial summary judgment on the Title VII claim and denied defendant's motion for summary judgment on the duty of fair representation claim.[2]

Now before the Court is plaintiff's motion pursuant to

---

[1] The section reads: "Suits for violation of contracts between an employer and a labor organization representing employees in an industry affecting commerce as defined in this Act, or between any such labor organizations, may be brought in any district court of the United States having jurisdiction of the parties, without respect to the amount in controversy or without regard to the citizenship of the parties."

[2] Defendant did not move for summary judgment on the remaining claims.

Federal Rules of Civil Procedure 59(e) and 60(b) and Local Civil Rule 6.3 of the United States District Courts for the Southern and Eastern Districts of New York ("Local Rule 6.3") for reconsideration of the portion of my February 12, 2009 order denying defendant's motion for summary judgment on the duty of fair representation claim. For the reasons stated below, the motion is denied.

## BACKGROUND

Familiarity with the underlying facts and procedural history of this case, as set forth in this Court's prior decision, *Done v. Brooklyn Hosp. Ctr.*, 2009 U.S. Dist. LEXIS 10676 (E.D.N.Y. February 12, 2009), is presumed. A brief recitation of facts relevant to this decision is provided below.

*The Parties*

Plaintiffs Tirado and Wagstaffe are stationary engineers, and plaintiffs Gustavo Done and Felix are firemen, who were simultaneously employed by the Hospital in the Engineering Department ("Department") and by the City of New York, Department of Citywide Administrative Services. Plaintiffs Gustavo Done and Grant are stationary engineers and firemen who were employed at the same time by Hospital and by the New York City Transit Authority. Gustavo Done, Tirado, and Felix are Hispanic males, and Wagstaffe, Jose Done, and Grant are black males.

Defendant Union is the bargaining representative for plaintiffs in connection with their employment with the Hospital, with whom defendant entered into a collective bargaining agreement ("CBA").

*"Mutuals"*

Plaintiffs are among engineers employed by the Hospital to operate its boiler room, who worked night shifts at the Hospital and day shifts elsewhere. In order to accommodate overlapping shifts with different employers, employees covered parts of each others' shifts or switched shifts entirely. For example, a person working the morning shift at the Hospital, which started at 7:30 a.m., would come to work at 6 a.m., to permit the overnight shift person to leave the Hospital and report for duty at the City's offices on Centre street by 7:00 a.m. The person whose shift was partially covered would later work extra time on behalf of the person covering his shift. Employees referred to shifts or parts of shifts that were swapped as "mutuals." When employees swapped shifts in this manner, they would punch each others' time cards. As a result, the log book did not reflect when an employee not assigned to work a certain shift had taken over that shift, although the engineer on duty was aware when an employee swapped a shift. Employees considered it unnecessary to report mutuals to the Hospital through the log book or any other means. Hospital

officials and staff were aware of the practice, and no prior authorization was required before performing mutuals.

Plaintiffs have provided names of several individuals other than plaintiffs who performed mutuals and who have not been disciplined. Of these employees, at least five were white, one was black, and one was Indian. As of 2005, employees in the boiler room continued to work both for the Hospital and for other City agencies and continued to perform mutuals for each other in order to cover shifts.

*Plaintiffs' Termination and Grievance Request*

In May of 2002, plaintiffs were individually summoned to the Hospital's Human Resources Department and told that the Hospital was conducting an investigation into staffing practices of the Engineering Department. Plaintiffs met with James Robson, representative to the Hospital for defendant Union, and requested that a lawyer; none was appointed. On May 29, 2002, plaintiffs were discharged by Hospital. On May 31, 2002, plaintiffs filed a grievance with the National Labor Relations Board. *See* Ex. 15 (letter from NLRB to Mr. Robson). On June 11, 2002, plaintiffs filed a grievance under the CBA against the Hospital. *See* Ex. 16. The latter grievance letter described the unfair treatment claim, noting that, while plaintiffs were black and Hispanic, the workers hired to replace them were white, despite the fact that

the Hospital was located in a non-white neighborhood. The letter also discussed a claim for payment for accrued vacation and sick days existing at the time plaintiffs' left their employment with the Hospital.

In June of 2002, the Union representative, a Mr. Robson, met with plaintiffs to discuss their discharges. Plaintiffs stated to Mr. Robson that they were being unfairly singled out for what was a general practice and gave Mr. Robson a copy of their Grievance Letter. Mr. Robson testified that plaintiffs admitted to him that they punched each others' timecards when performing mutuals. Mr. Robson performed no investigation into plaintiffs' case before the July 11 grievance meeting with Hospital officials, because plaintiffs "had no case." Mr. Robson did not investigate whether others were performing mutuals and stamping each others' timecards, because he "didn't want to be responsible for anyone else getting in trouble at the hospital."

On July 11, 2002, a grievance meeting was held. Mr. Robson asked plaintiffs what they had to say about the charges, whereupon each said that, as a group, they were being singled out, since others were swapping shifts and the Hospital knew about it. Mr. Robson made no additional effort to present the plaintiffs' case. The Hospital denied the grievance in writing. Following the denial of the grievance, Mr. Robson did not file a Step Three request for arbitration within ten days, as was

permitted under the CBA.

In April, 2003, after the commencement of litigation by plaintiffs, defendant invited plaintiffs to participate in an arbitration against the Hospital. Plaintiffs declined to participate, stating in a letter that they would not imperil their ongoing litigation against the Union. The Hospital subsequently requested a permanent stay of arbitration, based on the delay of ten months in requesting the arbitration, in violation of the 10 day time limit stated in the CBA, which was granted.

*Summary Judgment Opinion*

In my February 12 opinion, I found that plaintiffs were discharged by the Hospital for stamping each others' time cards and swapping shifts. I concluded that a reasonable fact finder could find that plaintiffs' claims of discrimination had merit, that the Union ignored or perfunctorily pressed plaintiffs' claims by failing to investigate them, and that this was an arbitrary action that violated the Union's duty of fair representation to plaintiffs. In reaching this conclusion, I noted that plaintiffs' grievance letter complained that they had been singled out on racial grounds for participating in a longstanding practice known to and effectively condoned by Hospital authorities, and that Mr. Robson chose not to pursue the

claim of unequal treatment. I noted that plaintiffs had produced evidence that many other Hospital employees were swapping shifts with each other, including the five white employees who replaced plaintiffs, and that five white employees were swapping shifts at the same time as plaintiffs and were not fired. I concluded that a proper investigation by defendant would have uncovered this information and additional information that could be used to make out a claim of unequal treatment against the Hospital, and that the deliberately lax performance on the Union's part rose to the level of arbitrariness.[3]

**DISCUSSION**

**I. Motion for Reconsideration Standard**

The standard for success on a motion for reconsideration "is strict, and reconsideration will generally be denied unless the moving party can point to controlling decisions or [factual] data that the court overlooked - matters, in other words, that might reasonably be expected to alter the conclusion reached by the court." *Shrader v. CSX Transp., Inc.*, 70 F.3d 255, 257 (2d Cir. 1995).[4] *Pereira v. Aetna Cas. and Sur. Co. (In re Payroll Express*

---

[3]In addition, I concluded that a reasonable jury could not find in favor of plaintiffs on their Title VII claim, given the lack of evidence that employees of different racial groups were treated differently by defendant Union, and therefore the defendant's motion for summary judgment was granted.

[4]Essentially the same standard is used to determine Rule 59(e) motions as motions under the Local Rule. Rule 59(e) "does not prescribe specific grounds for granting a motion to alter or amend an otherwise final judgment," *Munafo v. Metropolitan Transp. Authority*, 381 F.3d 99, 105 (2d Cir. 2004), and "district courts may alter or amend a judgment to correct a clear error of law

*Corp.)*, 921 F.Supp. 1121, 1123 (S.D.N.Y. 1996); *Violette v. Armonk Assocs., L.P.*, 823 F. Supp. 224, 226 (S.D.N.Y. 1993). Local Rule 6.3 "is to be narrowly construed and strictly applied so as to avoid repetitive arguments on issues that have been considered fully by the court." *Ades v. Deloitte & Touche*, 843 F. Supp. 888, 890 (S.D.N.Y. 1994). A Local Rule 6.3 motion is not to be used as a substitute for appeal. *See Morser v. A.T. & T. Information Systems*, 715 F. Supp. 516, 517 (S.D.N.Y. 1989); *Korwek v. Hunt*, 649 F. Supp. 1547, 1548 (S.D.N.Y. 1986). In its motion for reconsideration, a party may not "advance new facts, issues, or arguments not previously presented to the Court." *National Union Fire Ins. Co. v. Stroh Cos.*, 265 F.3d 97, 115 (2d Cir. 2001) (quotation omitted). The decision to grant or deny a motion for reargument is within the sound discretion of the Court. *See Devlin v. Transp. Comm'ns Union*, 175 F.3d 121, 132 (2d Cir. 1999).

Reconsideration is appropriate in light of an intervening change of controlling law, the availability of new evidence, the need to correct a clear error, or to prevent manifest injustice.

---

or prevent manifest injustice." *Id.* (internal citations and quotations omitted); *see also Wood v. F.B.I.*, 432 F.3d 78, 85 n.4 (2d Cir. 2005) (affirming denial of Rule 59(e) motion where "district court did not commit error or a manifest injustice"). "The standard for granting such a motion is strict, and reconsideration will generally be denied unless the moving party can point to controlling decisions or data that the court overlooked - matters, in other words, that might reasonably be expected to alter the conclusion reached by the court." *Shrader v. CSX Transp., Inc.*, 70 F.3d 255, 257 (2d Cir. 1995).

*See Doe v. New York City Dept. of Social Servs.*, 709 F.2d 782, 789 (2d Cir. 1983). Additionally, reconsideration is appropriate where a court misinterprets or misapplies relevant case law in its original decision. *See O'Brien v. Bd. of Educ. of Deer Park Union Free School Dist.*, 127 F. Supp. 2d 342, 346 (E.D.N.Y. 2001).

**II. Defendant's Claims of Error**

Defendant makes several new arguments in its motion for reconsideration that were not previously presented to the Court, some of which rely on facts not previously alleged, but which were known to defendant during briefing of defendant's motion for summary judgment. As such, defendant's arguments are outside of the proper scope for a motion for reconsideration, notwithstanding the fact that defendant casts them as issues that were overlooked in my February 12, 2009 opinion. Moreover, the arguments lack merit.

**A. Claims that the Court Overlooked Law**

Defendant claims the Court overlooked the legal requirement that in order to prevail on a § 301 duty of fair representation claim, a plaintiff must demonstrate that the employer breached its collective bargaining agreement ("CBA"), in addition to showing that the union breached its duty of fair representation. *See Sanozky v. Int'l Ass. of Machinists and Aerospace Workers*, 415 F.3d 279, 281 (2d Cir. 2005). Defendant argues that the

Hospital had just cause for firing plaintiffs and therefore did not violate the CBA,[5] particularly given that an employer need not fire all those guilty of a wrongful practice. Although defendant quoted language from *Sanozky* regarding the requirement that a plaintiff show a violation of the CBA, this particular argument was not previously raised by defendant in its motion for summary judgment, and is not properly presented in a motion for reconsideration. *National Union Fire Ins. Co.,* 265 F.3d at 115. In all events, a decision to terminate plaintiffs because of their race, color, or national origin can hardly be called just cause, so that even if properly argued, reconsideration would not lead to a different result.

**B. Claims that the Court Overlooked Facts**

*1. Card Stamping and Shift Swapping*

Defendant states that no evidence in the record indicates that the Hospital fired plaintiffs for shift swapping. Instead, defendant argues, the Hospital fired plaintiffs for punching each others' time cards when no person was working, resulting in pay for no work and gaps in coverage of the boiler room. Therefore, argues defendant, plaintiffs were properly fired by the

---

[5]The CBA does not contain provisions regarding proper and improper grounds for firing employees.

Hospital.[6]

Defendant did not make this distinction between stamping time cards and swapping shifts in its summary judgment papers. Instead, defendant quoted without comment the language used by the Hospital in its termination letters to plaintiffs, which does not make clear whether plaintiffs were fired for card stamping or shift swapping.[7] Because defendant's argument could have been asserted on summary judgment, but was not, it is not a proper basis for reconsideration. In any case, testimony by plaintiffs and other Hospital employees provides ample evidence that plaintiffs stamped each others' time cards as a means to the end of swapping shifts, rather than to claim wages for hours not worked. Furthermore, whether or not plaintiffs swapped shifts, and whether or not the Hospital fired plaintiffs believing that they had stamped each others cards without swapping shifts,

---

[6]Defendant alleges for the first time that if a person working a night shift normally ending at 7:30 a.m. had left at 6 a.m. and was immediately replaced by another worker at 6 a.m., the night-shift worker would simply have punched out at 6 a.m., making it unnecessary for workers to punch each other's time cards. Defendant draws the inference that, in the example just given, there was no worker on duty between 6 a.m. and 7:30 a.m., when the morning shift worker arrived, and therefore plaintiffs were fired with just cause. Defendant offers no evidence that this was the conclusion drawn by the Hospital and the basis upon which it fired plaintiffs. Furthermore, there is no indication that defendant investigated plaintiffs' activities at the time they were fired in order to determine that plaintiffs were simply stamping each others' cards rather than swapping shifts.

[7]The termination letter, which was referenced in my February 12 opinion, states that plaintiffs were discharged upon findings that they "[f]alsified business records, accepted wages under false pretenses," "[e]ngaged in unethical practices and those which conflicted with the interests of the Hospital," "[p]rovided cash and other forms of renumeration to co-workers in furtherance of [their] improper conduct, thereby causing said co-workers to engage in improper conduct themselves," and "[e]ngaged co-workers to acquiesce/participate in violations of employment." Pl. Ex. 22, 23, 24, 25.

plaintiffs' main contention remains that the Hospital unfairly targeted them as minority workers for participating in a widespread practice for which similarly situated white workers were not punished. Plaintiffs presented evidence that other employees were punching cards and swapping shifts as frequently as they had done. Defendant's contentions regarding plaintiffs being fired for just cause ignores this point.

*2. Knowledge that Plaintiffs Were Replaced by White Employees*

Defendant claims that plaintiffs were not replaced with white employees until 2005, three years after the termination hearing, and therefore defendant lacked the information necessary to make a claim of disparate treatment based on race. Defendant did not present this fact, nor the argument derived from it, in its summary judgment papers. Accordingly, it is inappropriately presented on a motion for reconsideration. Furthermore, as discussed in my previous opinion, Mr. Robson testified that he performed no investigation whatsoever, and therefore could not have had information upon which to form the opinion that plaintiffs' claims of racially disparate treatment lacked merit.

*3. Feasibility of Performing Investigation*

Defendant asserts that it was impossible to perform the investigation necessary to substantiate plaintiffs' claims. Mr. Robson could not be required to ask other Union members whether they punched each other's time cards, argues defendant, because

such an inquiry would not yield candid replies and could make trouble for those other employees. The difficulties inherent in investigating a claim that some employees were unfairly disciplined for a practice engaged in by most employees does not relieve the Union of its duty to make some attempt to do so. Assuming without conceding that asking employees directly about their own activities was impossible, Mr. Robson could have employed indirect methods to investigate whether the practice of punching time cards and swapping shifts was widespread. Mr. Robson also could have ascertained whether the Hospital officials responsible for firing plaintiffs had any history of racially disparate treatment. It is not the role of this Court to mandate precisely what actions should have been taken. Rather, as stated in my previous opinion, a reasonable fact finder could find that absolutely no action was taken, including determining what actions were possible, and that taking no action was a violation of the Union's duty of fair representation.

Defendant further argues that Mr. Robson could not be required to ask Hospital managers whether they had condoned the actions of employees punching each other's time cards, because such inquiries probably would have resulted in an intensive investigation and in terminations of other union members. This argument appears to assert that defendant Union was justified in sacrificing plaintiffs' jobs and benefits rather than properly

investigating whether plaintiffs were unfairly singled out. Defendant fails to identify any case law in the duty of fair representation context that permits such behavior.

**III. Vacation and Sick Pay Claims**

Defendant asserts that the status of plaintiffs Gustavo Done and Derrick Grant is 'in limbo' due the fact that my prior opinion did not rule on claims made by plaintiffs that they were owed payment for unused vacation and sick days. This observation does not fall within the recognized grounds for a motion for reconsideration. *See Doe*, 709 F.2d at 789. However, for the sake of clarity, I discuss the issue below.

Plaintiffs' complaint alleged that the Hospital violated the CBA by unlawfully discharging them and failing to pay them for accrued vacation and sick time following their discharge, and that defendant Union failed to represent them fairly in response to these actions. Defendant made no argument in its summary judgment papers regarding the failure to make payments for accrued benefits,[8] and did not indicate its position on whether

---

[8] In its statement of facts, defendant alleged that plaintiffs did not inform Mr. Robson that the Hospital owed them pay for accumulated sick and vacation time, and that they did not refer to any payments during the grievance meeting with the hospital. Defendant further alleged that plaintiffs had no records showing the accumulation of benefits, and they did not identify a clause in the CBA entitling them to pay in the event of termination for just cause. Defendant did not indicate its position on the import of these facts, nor did it offer its interpretation of the CBA regarding payment for accrued benefits after termination other than for just cause.

the CBA provided for the payment following improper termination.[9]

In my February 12 opinion, I found that defendant had failed to conduct any investigation whatsoever, and failed to timely request arbitration with the Hospital.[10] I did not draw a conclusion regarding the Union's responsibility to investigate plaintiffs' benefits claims, although the conclusion that a reasonable fact finder could find that the Union failed in its duty of fail representation applies to these claims. I included in my opinion the fact that, in June of 2002, plaintiffs gave Mr. Robson a copy of their Grievance Letter, which stated that they had been singled out for unfair treatment, and that they were entitled to payment for unused vacation and sick days (Ex. 16). If Mr. Robson had investigated plaintiff's allegations that they were unfairly terminated, he might have found that plaintiffs were not fired for just cause, which in turn could have entitled plaintiffs to benefits under the CBA and Hospital policy. According to the position taken by defendant, plaintiffs were

---

[9]Plaintiffs' complaints alleged that, pursuant to Hospital policy and the CBA, two weeks after an employee is discharged, the employee is entitled to receive a check for all accrued and unpaid benefits. The CBA states that employees are to receive various amounts of vacation time depending on the number of years they have served, but includes no provision for payment for accumulated vacation days upon termination. CBA § 8. The CBA also includes a clause stating that employees are permitted to "cash out" up to 7.5 days of sick leave each year, and that upon termination other than for just cause, employees are entitled to receive payment for accumulated sick leave according to a certain formula. CBA § 13.

[10]Defendant did request arbitration ten months later, but, as this was long past the deadline for arbitration demands pursuant to the CBA, that action was stayed.

fired for just cause, and therefore no investigation into their entitlement to benefits was warranted. As discussed in my previous opinion, this conclusion was faulty.

**CONCLUSION**

For the reasons stated herein, the motion for reconsideration by defendant Union is denied. The Clerk is directed to transmit a copy of the within to all parties and the assigned Magistrate Judge.

SO ORDERED.

Dated:   Brooklyn, New York
         June 9, 2009

                    By: /s/ Charles P. Sifton (electronically signed)
                                United States District Judge